## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## EVANSVILLE DIVISION

| | |
|---|---|
| J.A.W., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Cause No. 3:18-cv-37-WTL-MPB |
| ) | |
| EVANSVILLE VANDERBURGH ) | |
| SCHOOL CORPORATION, ) | |
| ) | |
| Defendant. ) | |

### ENTRY ON MOTION FOR PRELIMINARY INJUNCTION

This cause is before the Court on the Plaintiff's motion for preliminary injunction (Dkt. No. 19). The motion is fully briefed, and the Court held a hearing on the motion on July 20, 2018, after which the parties submitted proposed findings of fact and conclusions of law. The Court, having considered all of the parties' filings and the testimony presented and evidence admitted at the hearing, and being duly advised, **GRANTS** the Plaintiff's motion for the reasons set forth below.

### I. BACKGROUND

Plaintiff J.A.W. is a seventeen-year-old unemancipated minor; his mother is his sole legal and physical guardian.[1] J.A.W. is about to enter his senior year as a student at North High School in the Evansville Vanderburgh School Corporation ("EVSC"). He plans to graduate in December 2018.

J.A.W.'s assigned gender at birth is female. His birth certificate, which was obtained in Florida where he was born, identifies his sex as female, as does his Indiana driver's license,

---

[1]The Court already has addressed EVSC's arguments with regard to J.A.W.'s capacity to bring suit without his mother (or someone else) acting as his next friend. *See* Dkt. No. 33.

which he recently obtained. However, J.A.W. has long identified as male. When J.A.W. was 11 years old, he first encountered the term transgender and recognized that he was transgender.

J.A.W. began to feel uncomfortable using the girls' restrooms at school in sixth grade. In eighth grade he was assigned to a physical education class and felt uncomfortable using female locker rooms to change before and after class. He and his mother spoke to a social worker at school, and his schedule was changed so that he was no longer in a physical education class.

Beginning in eighth grade, J.A.W. began to present himself outwardly as a boy; he began sporting a male haircut and wearing masculine clothing. He also began to ask his teachers to address him by his chosen masculine name (J.A.W.) instead of the feminine name that was given to him at birth and to request that masculine pronouns be used to refer to him. J.A.W. was too intimidated at that time to seek permission to use the boys' restrooms at school.

During his freshman year, J.A.W. attended classes at both North High School and Central High School. As he entered puberty, he suffered increasing discomfort and distress relating to what he now knows to be gender dysphoria, which is defined in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") as "[a] marked incongruence between one's experienced/expressed gender and assigned gender . . . ." Dkt. No. 50-6 at 4. At that point he became extremely uncomfortable using the female restrooms at school.

J.A.W. was required to take physical education at North High School during his freshman year. Because he did not feel comfortable using the girls' locker room to change before and after gym class, he and another transgender student began using a boys' restroom for that purpose. They did not seek permission to do so, and EVSC administrators learned of the situation when a parent called to complain that there were "two girls" using the boys' restroom. EVSC told J.A.W. not to use the boys' restroom anymore; as an alternative, the two transgender students

2

were told to use another girls' locker room that was not otherwise being used. For other restroom needs, EVSC told J.A.W. that he could use the girls' restrooms or a gender-neutral, single-occupancy restroom in the nurse's office at North High School. This restroom generally is not used by students unless they are visiting the nurse or the office or have been granted permission to use it on a regular basis after demonstrating that they have a reason to do so. The nurse's restroom was located far from J.A.W.'s classes and therefore was inconvenient. He tried using it a few times but found it locked, so he stopped trying to use it. J.A.W. did not make any specific request with regard to restroom use at Central High School.

During his sophomore year, J.A.W. attended classes at both North High School and Harrison High School. Per his request, his teachers continued to address him as J.A.W. and use masculine pronouns to refer to him. Early in that school year, J.A.W. approached the principal of North High School with the "Dear Colleague" letter that was jointly issued on May 13, 2016, by the U.S. Department of Justice, Civil Rights Division, and the U.S. Department of Education, Office for Civil Rights, which J.A.W. believed entitled him to use the boys' restrooms at school.[2] EVSC reviewed the letter, consulted with counsel, and ultimately denied J.A.W.'s request to use the boys' restrooms. J.A.W. was instructed either to use the girls' restrooms or the gender-neutral, single-occupancy restroom in the nurse's office at North High School. J.A.W. was not informed of the availability of a gender-neutral restroom at Harrison High School; students are also required to obtain permission to use that restroom. The arrangements for J.A.W. to change before and after physical education class remained the same as the previous year.

---

[2]The "Dear Colleague" letter was rescinded by the Department of Justice and the Department of Education on February 22, 2017. J.A.W. does not assert it as a basis of his claim.

3

J.A.W. began counseling in September 2016 because he wanted confirmation that he had gender dysphoria. J.A.W. has submitted the Declaration of James D. Fortenberry, M.D., M.S., the director and founder of the Gender Health Program at Riley Children's Health in Indianapolis, who explains that the standards of care for gender dysphoria "recognize . . . that the principal treatment of gender dysphoria is to allow the person full expression of his or her gender identity." Dkt. 50-6 at 6. This involves both "social role transition," a process in which "a person presents themselves in a manner consistent with their experienced gender, which includes name, dress, hair style, and other aspects of gender presentation," as well as hormone therapy to "initiate[] the physiologic changes in body contour and appearance to match the experienced gender." *Id.* at 7. The ability to use public restrooms consistent with one's gender identity "is a prime component of gender affirmation." *Id.*

In June 2017, J.A.W.'s counselor wrote to his medical doctor and opined that J.A.W. met the criteria for Gender Dysphoria of Adolescence and that he would benefit greatly both medically and psychologically from hormone therapy. Based upon a diagnosis of gender dysphoria, J.A.W. was prescribed testosterone in the fall of 2017. He has been taking testosterone injections regularly since then.

In November 2016, during his sophomore year, J.A.W. sent an email to Dr. Dionne Blue, EVSC's Chief Diversity Officer, informing Dr. Blue that he was a transgender student and asking about EVSC's policy with regard to transgender students accessing restrooms and locker rooms. Dr. Blue responded that EVSC did not have an official policy, but that transgender students could use the nurse's office or other gender-neutral restrooms depending on the facilities available in the building. Dr. Blue further stated that schools would address any other needs on a case-by-case basis. J.A.W. did not follow up with Dr. Blue or make any requests of

her. During his sophomore year, J.A.W. did not complain to anyone at EVSC that the gender-neutral restrooms made available to him were inaccessible or otherwise unsatisfactory.

J.A.W. did not seek permission to use the boys' restrooms during the first semester of his junior year. On January 21, 2018, early in the second semester, J.A.W.'s attorney contacted EVSC on his behalf and informed EVSC that pursuant to the Seventh Circuit's decision in *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017), *cert. dismissed sub nom. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ. v. Whitaker ex rel. Whitaker*, 138 S. Ct. 1260 (2018), he believed that J.A.W. was entitled to use the boys' restrooms at school. The letter did not mention J.A.W.'s mother's position on the issue. EVSC's general counsel responded that *Whitaker* was distinguishable on its facts, that it did not appear to represent the state of the law across the United States, and that J.A.W. would not be permitted to use the boys' restrooms at school. This lawsuit ensued.

Prior to the institution of these proceedings, EVSC had never been made aware that J.A.W. had been diagnosed with gender dysphoria, that he was undergoing hormone therapy, or that he had any complaints regarding the proximity and accessibility of the gender-neutral restroom EVSC had made available to him. However, EVSC is now aware that J.A.W. has been diagnosed with gender dysphoria and that he has been undergoing hormone therapy for almost a year. Since beginning hormone therapy, his appearance and voice have become more masculine; he has developed a patchy beard, he has lost weight, and his abdomen has developed more of a male appearance. He no longer menstruates. At the hearing, he looked and sounded like a teenaged boy; he is very unlikely to be mistaken for a girl at this point. Given these facts, EVSC's position that J.A.W. "has merely announced to EVSC that he is male and demanded

access to facilities inconsistent with the gender marker appearing on the birth certificate his mother provided to EVSC at the time of his enrollment," Dkt. No. 65 at 22, is simply incorrect.

To avoid having to use restrooms at school, J.A.W. severely restricts his fluid intake in an attempt to prevent himself from having to go the bathroom while at school. This causes him pain and discomfort. On the few occasions in the past that J.A.W. could not wait, he used the girls' restrooms at school, as he did not want to be disciplined by EVSC.[3] Using the girls' restrooms is extremely upsetting to him and makes him feel ostracized from his peers because, as he testified, it "contradicts what I am projecting to the world of what I identify as." Dkt. No. 61 at 18-19. J.A.W. also testified that using the girls' restroom at school draws attention to the fact that he is transgender, and that female peers at school have expressed discomfort with him using the girls' restrooms because he appears male. *Id.* at 21.

EVSC has no written policy regarding transgender students' use of restrooms. While EVSC asserts in its surreply brief that its policy is "to make restroom assignments based on the sex listed on the student's birth certificate or other comparable government-issued identifying documents used to enroll the student, and to consider parental requests to deviate from that default position on a case-by-case basis," Dkt. No. 59 at 1, the evidence of record does not support that assertion. Dr. David Smith, EVSC's superintendent, testified that EVSC does not have a formal policy at all; it has a "practice." Dkt. No. 61 at 38. He further testified that EVSC's position is that J.A.W. may not use boys' restrooms because "biologically he is female." *Id.* at 39. However, he also testified that if J.A.W. were to legally have his birth certificate changed so that it indicated his sex was male, then under EVSC's current, unwritten practice,

---

[3]EVSC's superintendent, Dr. David Smith, testified that if J.A.W. were to use a boys' restroom at school, he would be subject to discipline for "defiance." Dkt. No. 61 at 37.

J.A.W. would be permitted to use the boys' restrooms at school, because a birth certificate would be an "objective standard" by which to determine that it was appropriate for him to do so. He also conceded that if J.A.W. were to have his birth certificate changed but his use of the boys' restrooms nonetheless caused a "disruption," EVSC could respond by again barring J.A.W. from the boys' restrooms. *Id.* at 54.[4]

## II. DISCUSSION

The issue now before the Court is a narrow one: whether J.A.W. is entitled to the preliminary injunctive relief he seeks, which is that he be allowed to use the boys' restrooms within the schools and other buildings of EVSC. A preliminary injunction is "an extraordinary remedy" that "[i]s never awarded as a matter of right." *Whitaker*, 858 F.3d at 1044 (citations omitted).

> A two-step inquiry applies when determining whether such relief is required. First, the party seeking the preliminary injunction has the burden of making a threshold showing: (1) that he will suffer irreparable harm absent preliminary injunctive relief during the pendency of his action; (2) inadequate remedies at law exist; and (3) he has a reasonable likelihood of success on the merits. If the movant successfully makes this showing, the court must engage in a balancing analysis, to determine whether the balance of harm favors the moving party or whether the harm to other parties or the public sufficiently outweighs the movant's interests.

*Id.* (citations omitted).

---

[4] In fact, there does not appear to be any legal means for J.A.W. to have his birth certificate changed at this time; the provision of law cited by EVSC in support of its argument that J.A.W. could do so does not support that proposition, but rather supports the opposite conclusion. *See* Dkt. No. 41 at 21 n.8 (incorrectly citing Fla. Stat. Ann. § 382.016 and Fla. Admin. Code Ann. R. 64V-1.003 for the proposition that Florida "allows transgender individuals to have the gender marker on their birth certificate changed upon presentation of a physician letter confirming clinical treatment for gender transition").

## A. Likelihood of Success

In order to demonstrate a likelihood of success on the merits in the context of seeking a preliminary injunction, a plaintiff "must only show that his chances to succeed on his claims are 'better than negligible.'" *Id.* at 1046 (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)). "This is a low threshold," *id.*, and one that, given the court's holding in *Whitaker*, J.A.W. easily meets.

### 1. Title IX

J.A.W. asserts in this case that EVSC's refusal to permit him to use boys' restrooms violates Title IX, 20 U.S.C. § 1681(a), which prohibits a covered institution[5] from discriminating on the basis of sex. In *Whitaker*, the Seventh Circuit held that a transgender high school student demonstrated a likelihood of success on his claim that his school's denying him access to the boys' restroom based on his transgender status violated Title IX:

> A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX. The School District's policy also subjects Ash, as a transgender student, to different rules, sanctions, and treatment than non-transgender students, in violation of Title IX. Providing a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates the Act.

*Whitaker*, 858 F.3d at 1049-50. This is equally true of EVSC's policy in this case.

EVSC argues that *Whitaker* "was not . . . a mandate requiring school corporations to allow unemancipated minors who profess to be transgender access to the restrooms of their choosing on the strength of nothing more than their own demands," Dkt. No. 65 at 20, and asserts that *Whitaker* is distinguishable from this case in several respects. First, it points to the

---

[5]There is no dispute that EVSC is a covered institution under Title IX because it receives federal funds.

Seventh Circuit's observation in *Whitaker* that it was "'not a case where a student has merely announced that he is a different gender,'" *id.* (quoting *Whitaker*, 858 F.3d at 1050), and argues that this demonstrates that "some threshold showing is required to trigger the protections for transgender students discussed in *Whitaker*, and a mere 'announcement' of one's transgender status is insufficient," *id.* at 20-21. Thus, it argues, *Whitaker* did not hold that "schools are prohibited from requiring a parental request prior to allowing transgender students to access restrooms in alignment with their gender identity" or that "schools are prohibited from requiring some evidence that access to such facilities is medically, psychologically, and developmentally necessary and appropriate for the individual student." Dkt. No. 65 at 21. That is true—*Whitaker* did not specifically hold either of those things. But that is irrelevant to the issue now before the Court, because EVSC has made it clear, through the testimony of Dr. Smith, that its decision to prohibit J.A.W. from using boys' restrooms was not based on either a requirement that there be a parental request or a requirement of any sort of evidence regarding what is necessary and appropriate for J.A.W. Rather, EVSC's position unequivocally is that unless and until J.A.W. obtains a birth certificate that states that his sex is male—something that appears to be legally impossible for him to do at this point in time—he will not be permitted to use the boys' restrooms. And in that fundamental sense, this case is indistinguishable from *Whitaker*. In other words, there likely is a line to be drawn with regard to when Title IX requires a school to permit a transgender student to use the restrooms that coincide with his gender identity, but in this case EVSC has drawn that line in a place that the Seventh Circuit has already indicated is likely unacceptable. Therefore, the Court finds that J.AW. has sufficiently established a reasonable likelihood of success on the merits of his claim under Title IX.

## 2. Equal Protection

The court in *Whitaker* further held that the plaintiff also had a likelihood of success on the merits of his Equal Protection claim, a claim also asserted by J.A.W. As the Seventh Circuit noted:

> The Equal Protection Clause of the Fourteenth Amendment is essentially a direction that all persons similarly situated should be treated alike. It therefore, protects against intentional and arbitrary discrimination. Generally, state action is presumed to be lawful and will be upheld if the classification drawn by the statute is rationally related to a legitimate state interest.
>
> The rational basis test, however, does not apply when a classification is based upon sex. Rather, a sex-based classification is subject to heightened scrutiny, as sex frequently bears no relation to the ability to perform or contribute to society. When a sex-based classification is used, the burden rests with the state to demonstrate that its proffered justification is exceedingly persuasive. This requires the state to show that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives. It is not sufficient to provide a hypothesized or *post hoc* justification created in response to litigation. Nor may the justification be based upon overbroad generalizations about sex. Instead, the justification must be genuine.

*Whitaker*, 858 F.3d at 1050 (citations and internal quotation marks omitted). The court then found that "the School District's policy cannot be stated without referencing sex, as the School District decides which bathroom a student may use based upon the sex listed on the student's birth certificate" and thus the "policy is inherently based upon a sex-classification and heightened review applies." *Id.* at 1051. Finally, the court held that the school district had not met its burden of demonstrating that its justification for its restroom policy was "not only genuine, but also exceedingly persuasive." *Id.* at 1051-52 (citation and internal quotation marks omitted).

In *Whitaker*, the asserted justification for the restroom policy was the need to protect the privacy rights of all of the students in the district. The Seventh Circuit found that privacy

argument to be "based on sheer conjecture and abstraction." *Id.* at 1052. The same is true of EVSC's stated justification for its practice in this case: "preventing disruption and protecting the safety of all of its students, both transgender and cisgender." Dkt. No. 41 at 19.

With regard to the prevention of "disruption," EVSC has presented no evidence to support this justification beyond Dr. Smith's testimony that he believes there would be "substantial disruption" if "children were allowed simply to choose bathrooms based upon their subjective gender identity" and that "the parent body would object." Dkt. No. 61 at 33-34. But as the Court has already noted, at this point[6] J.A.W. is not asking to simply choose a restroom based on his subjective gender identity. He has been diagnosed with gender dysphoria and has been taking male hormones—which have altered his appearance and his voice—for almost a year. Further, EVSC has not described what form this "disruption" would take beyond complaints from parents, which the court found insufficient in *Whitaker*. *See Whitaker*, 858 F.3d at 1052 (finding that the receipt of one complaint from a parent and the fact that some parents and other community residents had spoken out in opposition—including at a school board meeting—to the plaintiff using the boys' restrooms insufficient to support the school district's position). In fact, when asked whether there had been any complaints from parents or students "as it relates to bathroom usage in transgender," Dr. Smith related the following:

> Well, as recently as last month, in speaking to an administrator at—the day after the Monday after I was deposed, she referenced two situations that had occurred in the building where she is principal; had a parent, a mother, that called that was extremely upset because the daughter had been exposed to a transgender man that had gone into the restroom and she felt very—I think the words were scared, vulnerable and terrified.

---

[6]Whether that may have been the case at some point—e.g., when J.A.W. first raised the issue several years ago—is irrelevant to whether J.A.W. is entitled to the prospective injunctive relief he seeks now.

Dkt. No. 61 at 33. But that anecdote supports J.A.W.'s position. Under EVSC's policy, J.A.W.—a transgender male—is supposed to use the girls' restrooms. Thus EVSC's own policy has apparently caused the sort of "disruption" that EVSC is trying to avoid.

In any event, the practice identified by EVSC—determining which restroom a student may use based upon the student's birth certificate—is inconsistent with the articulated reason for the policy. As Dr. Smith conceded at the hearing, whatever hypothetical disruption that might occur if J.A.W. were to use the boys' restrooms at school would not be caused by what J.A.W.'s birth certificate says; it is unlikely that those causing the disruption would be aware of the content of his birth certificate or that their opinion that J.A.W. should not be using the boys' restrooms would change simply because a different box was checked on that document.

With regard to the need to protect its students' safety, EVSC points to J.A.W.'s testimony that "transgender people sometimes face safety issues in public restrooms and that he feels safer using single-occupancy restrooms." Dkt. No. 65 at 13 (citing Dkt. No. 61 at 17-18). However, on cross-examination, J.A.W. further testified that now that his outward appearance is masculine, there are safety issues associated with using the girls' restrooms at school. Dkt. No. 61 at 21. The record before the Court does not support a finding that either student safety or the need to prevent "disruption" is an exceedingly persuasive justification for EVSC's transgender restroom policy. Accordingly, the Court finds that J.A.W. has met the "low threshold" of demonstrating a probability of success on his Equal Protection Claim.

### B. <u>Inadequate Remedy and Irreparable Harm</u>

A plaintiff seeking preliminary injunction "must show that [he] has no adequate remedy at law and, as a result, that [he] will suffer irreparable harm if the injunction is not issued."

*Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) (citing *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 386 (7th Cir. 1984)).

> This requires more than a mere possibility of harm. It does not, however, require that the harm actually occur before injunctive relief is warranted. Nor does it require that the harm be certain to occur before a court may grant relief on the merits. Rather, harm is considered irreparable if it cannot be prevented or fully rectified by the final judgment after trial.

*Whitaker*, 858 F.3d at 1045 (citations and internal quotation marks omitted).

J.A.W.'s testimony, which the Court finds to be credible, establishes that he experiences discomfort, distress, and anxiety when he is forced to use a girls' restroom because it is inconsistent with his male identity. In addition, using the girls' restrooms at school causes him distress because it draws attention to the fact that he is transgender, and he is aware that female students at school have expressed discomfort with him using the girls' restrooms because he appears male. In addition, using the nurse's restroom is not a satisfactory option, both for practical reasons—i.e., its location—and because it forces him to have different restroom arrangements than his peers, undermining his social role transition. The Court finds that the likely negative emotional consequences of being denied access to the boys' restrooms at school would constitute irreparable harm to J.A.W. because it would be "difficult—if not impossible—to reverse." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011) (citing *Hollingsworth v. Perry*, 558 U.S. 183 (2010) (per curiam)).

EVSC argues that J.A.W. could be compensated by monetary damages for the emotional distress he alleges and therefore he has not demonstrated that he has no adequate remedy at law. However, as the court noted in *Whitaker*, "[w]hile monetary damages are used to compensate plaintiffs in tort actions, in those situations the damages relate to a past event, where the harm was inflicted on the plaintiff through negligence or something comparable. But this case is not

the typical tort action, as [the plaintiff] has alleged *prospective* harm." *Whitaker*, 858 F.3d at 1054. And while EVSC argues, correctly, that the harm identified by J.A.W. is not as severe as the harm identified by the plaintiff in *Whitaker*, who asserted that his school's restroom policy had caused him to contemplate suicide, that does not mean that the less severe harm identified by J.A.W. could be fully rectified by an award of money damages. The Court finds that a monetary award would be an inadequate remedy for the type of stress and anxiety J.A.W. likely would experience for the remainder of his time in high school if an injunction were not granted.

In addition,

> for some kinds of constitutional violations, irreparable harm is presumed. *See* 11A Charles Alan Wright et al., Federal Practice & Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

*Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). Those constitutional violations "cannot be compensated by damages." *Id.* The Seventh Circuit has held that First and Second Amendment violations fall into that category, because they both protect "intangible and unquantifiable interests." *Id.* By contrast, the Seventh Circuit has held that Fourth Amendment violations do not fall into that category because "[d]amages are a normal, and adequate, response to an improper search or seizure, which as a constitutional tort often is analogized to (other) personal-injury litigation." *Campbell v. Miller*, 373 F.3d 834, 835 (7th Cir. 2004) (citing *Wilson v. Garcia,* 471 U.S. 261 (1985)); *see also Ezell*, 651 F.3d at 699 n.10 (distinguishing *Campbell* based on different types of constitutional claims). The Court finds that Equal Protection claims are more closely analogous to claims under the First and Second Amendments than to those brought under the Fourth Amendment, and therefore it is appropriate to presume irreparable harm with regard to J.A.W.'s Equal Protection claim. *Accord Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 738-39 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir. 2016)).

14

Finally, EVSC argues that J.A.W.'s "delay in filing suit and seeking injunctive relief belies any claim that EVSC's bathroom policy may cause him irreparable harm." Dkt. No. 41 at 23 (citing *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001)). The Court disagrees that the circumstances of this case warrant such a finding, as demonstrated by the case cited by EVSC in support of its argument:

> Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered. *See Ideal Industries, Inc. v. Gardner Bender, Inc.,* 612 F.2d 1018, 1025 (7th Cir. 1979). Whether the defendant has been "lulled into a false sense of security or had acted in reliance on the plaintiff's delay" influences whether we will find that a plaintiff's decision to delay in moving for a preliminary injunction is acceptable or not. *Id.* Jones has not presented any affirmative evidence that Ty's delay in seeking a preliminary injunction caused Jones to be lulled into a false sense of security or that Jones in any way relied on Ty's delay. The magistrate judge therefore properly decided that the evidence of mere delay alone, without any explanation on Jones' part of why such a delay negatively affected them, would not lessen Ty's claim of irreparable injury.

*Ty, Inc.,* 237 F.3d at 903. Here, too, EVSC has not explained how any delay by J.A.W. in bringing suit negatively affected it; in the absence of such a showing, the delay does not lessen J.A.W.'s claim of irreparable injury.

### C. **Balance of Harms**

Next, the Court must "look at whether granting preliminary injunctive relief will harm the School District and the public as a whole." *Whitaker*, 858 F.3d at 1054.

> Once a moving party has met its burden of establishing the threshold requirements for a preliminary injunction, the court must balance the harms faced by both parties and the public as a whole. This is done on a "sliding scale" measuring the balance of harms against the moving party's likelihood of success. The more likely he is to succeed on the merits, the less the scale must tip in his favor. The converse, however, also is true: the less likely he is to win, the more the balance of harms must weigh in his favor for an injunction to issue.

*Id.* (citations omitted).

EVSC argues that "[t]he potential harms to EVSC in terms of its operational efficiency and ability to maintain a safe and appropriate learning environment for all 23,000 of its students outweigh Plaintiff's claim of unquantified emotional distress." Dkt. No. 65 at 23. However, EVSC has not demonstrated that it would suffer any harm if an injunction were to issue. First, it argues that "[a] policy that would allow students to simply declare their gender regardless of the information their parents have provided to the school on that subject would be unworkable and could potentially place schools at cross-purposes with parents," Dkt. No. 65 at 23, but an injunction would not institute such a policy; rather, it would simply require EVSC to permit J.A.W. to use the boys' restrooms. *See* Dkt. No. 19 at 2. There is no evidence of record that this would conflict with J.A.W.'s mother's wishes; in fact, the record demonstrates that she is supportive of J.A.W.'s "efforts in this litigation to obtain access to male restrooms within his schools." Dkt. No. 50-4 (Declaration of J.A.W.'s mother). Next, EVSC points to its "concerns regarding the safety and privacy of all of its students, including Plaintiff, in locker rooms and restrooms." Dkt. No. 65 at 23. As discussed above, however, EVSC has not demonstrated that permitting J.A.W. to use the boys' restrooms would be less safe than his use of the girls' restrooms, and locker room use would not be implicated by the preliminary injunction sought by J.A.W. There is certainly no evidence that J.A.W. poses any threat to any other student, regardless of which restroom he uses. Finally, while EVSC mentions privacy in addition to safety, privacy was not mentioned in its brief, and the only testimony EVSC offered with regard to privacy is as follows:

> [T]here are privacy concerns. This is not just about restroom usage. This is locker room, who can undress around whom, who can shower with whom. . . . . Overnight field trips, sports . . . .

Dkt. No. 61 at 31. Thus EVSC has not articulated what its privacy concerns with regard to restroom usage are and has not demonstrated that those concerns outweigh the likely harm to J.A.W. discussed above. *See also Whitaker*, 858 F.3d at 1052 (noting that school's policy "does nothing to protect the privacy rights of each individual student vis-à-vis students who share similar anatomy and it ignores the practical reality of how . . . [the plaintiff], as a transgender boy, uses the bathroom: by entering a stall and closing the door").

With regard to the public interest, EVSC's arguments do not relate to any interest the public may have in preventing J.A.W. from using the boys' restrooms. Rather, EVSC argues that granting J.A.W. the injunction he seeks would "be a marked expansion of even the broadest interpretations of Title IX and the Equal Protection Clause to date" and would "complicate matters even further for school districts across the country already struggling with these complex and often highly divisive issues." Dkt. No. 65 at 24. In light of the fact that, as discussed above, the issuance of an injunction in this case would not require moving the applicable line from where the court in *Whitaker* has already drawn it, the Court finds that argument to be without merit.[7]

Because J.A.W. has demonstrated that he likely will suffer harm if an injunction is not granted, and EVSC has not articulated any harm that it or the public would suffer specifically

---

[7]The Court notes that J.A.W. has submitted evidence, in the form of declarations from various individuals, that demonstrates that other school districts have permitted transgender students to use the restrooms that are consistent with their gender identity, in some cases for many years, and that chaos and disruption have not resulted. *See* Dkt. Nos. 50-8 and 50-9; *see also Whitaker*, 858 F.3d at 1054-55 (citing similar statements made by *amici* in that case that "the frequently-raised and hypothetical concerns about a policy that permits a student to utilize a bathroom consistent with his or her gender identity have simply not materialized"). This evidence contradicts EVSC's assumption regarding the potential risk to schools around the country.

from the issuance of an injunction, the Court finds that the balance of harms weighs in favor of granting J.A.W.'s request.

### III. **CONCLUSION**

For the reasons set forth above, J.A.W.'s motion for preliminary injunction (Dkt. No. 19) is **GRANTED**. EVSC shall permit J.A.W. to use the boys' restrooms within the schools and other buildings of EVSC. No bond will be required.

SO ORDERED: 8/3/18

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification